

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

NMA/ALC
F. #2014R00055

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

March 20, 2015

By Hand and ECF

The Honorable Allyne R. Ross
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:   United States v. Jerome Asaro
>        Criminal Docket No. 14-26 (S-3) (ARR)

Dear Judge Ross:

The government respectfully submits this letter memorandum in advance of the sentencing of defendant Jerome Asaro in the above-referenced case, scheduled for Thursday, March 26, 2015 at 2 p.m. For the reasons set forth below, the Court should sentence the defendant to a term of imprisonment within his advisory United States Sentencing Guidelines ("Guidelines") range of 77 to 96 months' imprisonment.

I.    Background

The defendant was arrested on January 23, 2014 based on an indictment charging him with one count of racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), one count of extortionate collection of credit conspiracy, in violation of 18 U.S.C. § 894(a)(1), and one count of extortionate collection of credit, in violation of 18 U.S.C. § 894(a)(1). The racketeering conspiracy charge alleged a pattern of racketeering activity spanning over forty years, from 1968 through 2013. On February 12, 2014, a grand jury returned a superseding indictment charging the defendant with one additional count of collection of unlawful debt conspiracy in violation of 18 U.S.C. § 1962(d).

On October 10, 2014, Asaro pled guilty to the sole count of the above-referenced superseding information (the "Information"), which alleged his participation in a racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), between January 1, 1968 and December 31, 1987. The charge is based on conduct described in more detail below, which the defendant committed while an associate of the Bonanno organized crime family (the

"Bonanno family") of La Cosa Nostra ("LCN"), as part of his participation in the Bonanno family's criminal activities. The defendant has been in custody since his January 23, 2014 arrest.

> A.     Offense Conduct

The charged racketeering conspiracy alleges two predicate acts. First, between January 1984 and December 1986, the defendant was an accessory after the fact to the murder of Paul Katz, in violation of New York Penal Law. Second, between January 1980 and January 1981, the defendant damaged a building located at 8601 Rockaway Boulevard in Ozone Park, New York, by starting a fire, and conspired to do the same. See Presentence Investigation Report ("PSR") ¶ 1.

> 1.     The Murder of Paul Katz

In the 1960s, Paul Katz was a criminal associate of James "Jimmy the Gent" Burke, a powerful associate of the Lucchese crime family (the "Lucchese family") of La Cosa Nostra. PSR ¶ 12. Katz had a warehouse in Queens, which Burke, Vincent Asaro and other criminals used to store items stolen during robberies. PSR ¶ 25. The warehouse was raided by law enforcement and during the raid, Vincent Asaro, Burke, and others were arrested. Id. As a result of their arrests, Katz was suspected to be a government informant. Id.

In December of 1969, Vincent Asaro and James Burke murdered Paul Katz because they believed he was cooperating with law enforcement, in violation of the rules of organized crime. Vincent Asaro and Burke strangled Katz to death with a dog chain. They then buried him in the basement of a house then under construction located in the vicinity of 102nd Road between 82nd and 84th Street in Queens, New York. PSR ¶ 26. In the early 1980s, Asaro directed the defendant Jerome Asaro and another individual ("Individual 1") to dig up and move Katz's body. PSR ¶ 27. Together the defendant and Individual 1 went to the basement, dug up Katz's decomposed body, and re-cemented the area. Id. The defendant took Katz's remains and disposed of them.

On June 17, 2013, the Federal Bureau of Investigation ("FBI") began to dig for the remains of Paul Katz in the basement location identified by Individual 1. PSR ¶ 28. During the search, the FBI recovered human remains, including bones, hair and teeth. PSR ¶ 30. These remains were positively identified by DNA testing as those of Paul Katz. Id.

During the defendant's guilty plea before the Court, he was placed under oath and stated, in relevant part, "in fact knowing that a murder had been committed, I assisted persons in moving the body of that person after the fact." See Oct. 10, 2014 Guilty Plea Transcript at 21, attached as Exhibit A. When the Court asked whether the defendant acted, "in order to hinder or prevent the apprehension of the individual who committed that murder," the defendant stated, "Yes, I did." See Exh. A at 21.

2.    Arson of Afters

In 1981, Vincent Asaro directed the defendant and Individual 1 to burn down "Afters," a night club used as a meeting place for organized crime members and other criminals located in Ozone Park, New York. PSR ¶ 31. An individual named Dominic Cataldo, who was also affiliated with LCN, owned an Italian restaurant across the street from Afters and was upset that the new owners of the social club were going to cater to African-Americans. Id. The defendant and Individual 1 poured gasoline inside Afters and then threw a lit object into the club to ignite the gasoline. Id.

During his guilty plea, the defendant stated, "I conspired to damage a building by starting a fire" and that he helped to start the fire. See Exh. A at 21-22.

B.    The Plea Agreement

The defendant pled guilty pursuant to a plea agreement with the government, which calculated a total offense level of 24[1] and a criminal history category of IV, resulting in an advisory Guidelines range of 77 to 96 months' imprisonment. This analysis calculated the highest offense level as a 30, less two levels for minor role pursuant to § 3B1.2(b), three levels for acceptance of responsibility pursuant to § 3E.1.1(a) and (b), and one level for global disposition pursuant to § 5K2.0.[2]

While defense counsel objects to portions of the PSR related to the defendant's criminal history category, the defendant stipulated in the plea agreement to the Guidelines calculation, which included a criminal history category of IV. See Plea Agreement at 3, attached as Exh. B. In any event, the defendant is wrong when he argues that sentences imposed for conduct that occurred after the offense of conviction cannot be considered for

---

[1]    The PSR also included in its Guidelines analysis three additional uncharged racketeering acts, including a solicitation to murder, a conspiracy and attempt to rob an armored car and a conspiracy to rob gold salts, concluding that this additional criminal conduct, which was the subject of prior indictments in this case, is considered relevant conduct to the racketeering conspiracy. PSR ¶¶ 36-43. The Probation Department is correct that the government can prove such acts by a preponderance of the evidence; however, the government does not seek to do so at this time and as set forth below, respectfully submits that a sentence at the high-end of the advisory Guidelines range is appropriate.

[2]    The government objects to the PSR's inclusion of a three-point role enhancement, see ¶¶ 57, 63. Throughout the period of the offense of conviction, the defendant was an associate of the Bonanno family and should not be characterized as a "manager or supervisor" based both upon his role in the crime family and the specific conduct at issue. See United States v. Ivezaj, 568 F.3d 88 (2d Cir. 2009)(for sentencing purposes, a RICO defendant's role adjustment is to be made on the basis of the defendant's role in the overall RICO enterprise, rather than on basis of his role in each underlying predicate).

3

criminal history category purposes. Application Note 1 of Guidelines § 4A1.2 defines "prior sentence" as a "sentence imposed prior to sentencing on the instant offense, other than a sentence for conduct that is part of the instant offense." Probation is not including "relevant conduct" when it calculated the criminal history category using the defendant's 1989 and 2007 convictions. If those convictions constituted relevant conduct, which the defendant would undoubtedly dispute, they could not also be counted towards the defendant's criminal history. Based upon the government's calculation, the defendant has a total of nine criminal history category points, resulting in application of Criminal History Category IV.[3]

II.     Discussion

        A.     Applicable Law

        It is settled law that a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Gall v. United States, 552 U.S. 38, 49-50 (2007) (citation and footnote omitted). Title 18, United States Code, Section 3553(a) provides, in part, that in imposing sentence, the Court shall consider:

        (1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]

        (2) the need for the sentence imposed--

                (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

                (B) to afford adequate deterrence to criminal conduct; [and]

                (C) to protect the public from further crimes of the defendant.

---

[3]     The government respectfully submits that the defendant is also incorrect when he argues that two points should not be added to the criminal history category calculation based upon the defendant's commission of the offense while on supervised release based upon the false assertion that he was not on supervised release at the time of the offense. See PSR ¶ 103. The racketeering conspiracy charge to which the defendant pled guilty spanned the time period from January 1, 1968 through December 31, 1987. On July 4, 1980, the defendant was arrested for attempted arson, and on May 19, 1982, the defendant was sentenced to 60 days' imprisonment and three years' probation. Therefore, Probation is correct that the defendant committed the offense while under a criminal justice sentence and as a result, two points should be added to the defendant's criminal history score for a total of nine points, resulting in a criminal history category of IV. Again, the defendant stipulated to this calculation as part of his plea agreement with the government.

B.  Asaro Should Be Sentenced At the High End of the Guidelines Range

1.  Nature and Circumstances of the Offense

The offense of conviction is exceedingly serious. The defendant is perhaps the only person who knows the location of Paul Katz's body. For over forty years, Paul Katz's family has suffered, not knowing what happened to him. Katz's wife Dolores was left to raise five children on her own. See Ltr. of Ilsa Katz, attached as Exh. C; Ltr. of Lawrence Katz, attached as Exh. D. His wife died in 2001 without knowing his fate. See Exh. C at 2. As a result of the FBI search, certain of Katz's remains were returned to his son Lawrence Katz, daughter Ilsa Katz and other family members. Nonetheless, the loss of their father left an irreparable "void at every [family] event." Id. Ilsa Katz described the impact on their lives, stating, "when they killed my father[,] [t]hey also killed our family and our future." See Exh. C at 2. To this day, Lawrence Katz wears a mustache to disguise his resemblance to his father, which causes him pain. Id. See Exh. D at 2.

While the defendant did not strangle Katz to death, his actions made it easier for those responsible to evade being held accountable for their crimes, for the cold-blooded murder of Paul Katz. Taken together, his actions in moving Katz's body and hiding it again, as well as burning the Afters lounge, recommend a significant sentence of incarceration at the high-end of the advisory Guidelines range. Indeed, by burning down the social club to avoid its use by African-Americans, itself a reprehensible and racist aim, the defendant placed the lives and property of other individuals in grave danger. Additionally, both of these crimes were undertaken on behalf of a violent and notorious criminal enterprise, in order to for the defendant to ingratiate himself with members of the Bonanno family, which resulted in his rise to a leadership position in recent years, as described below.

2.  History and Characteristics of the Defendant

This case is a contradiction, both typical and atypical of mafia cases. On one hand, the defendant is the quintessential Mafioso, a third generation member of the Bonanno crime family who has been loyal to his family for over forty years, including by covering up a gruesome murder and burning a social club open to minorities in an Italian neighborhood. On the other hand, the defendant is, by mafia standards, educated, having graduated from high school, and skilled, owning and operating numerous businesses since a young age.

Despite his education and skill set, the defendant has a storied criminal history, which includes arrests for attempted petit larceny (age 19), attempted arson (age 22), assault (age 25), criminal possession of stolen property (age 28), and racketeering, including predicate acts of gambling and extortion (age 48). In 2008, the Honorable Sandra L. Townes sentenced the defendant to thirty months' imprisonment for racketeering. In that case, the defendant's plea agreement calculated a Guidelines range of 33 to 41 months' imprisonment; however, Judge Townes showed leniency and sentenced the defendant below the Guidelines range. The defendant repaid that leniency by resuming his activities on behalf of the Bonanno crime family, including by sponsoring new members for induction, as set forth below.

5

The defendant was released from jail on November 2, 2010. Less than one year later, in May of 2011, the defendant violated the special condition of his supervised release that he not associate with individuals associated with organized crime when law enforcement agents observed organized crime associates at his daughter's wedding of whose attendance he had not notified Probation in advance, including the Gambino family associate with whom he committed the attempted robbery described above. The defendant acknowledged this conduct in a consensually recorded conversation with Individual 1 on August 15, 2011, during which the defendant stated that the Gambino family associate was his "childhood friend," whom he had known for 45 years and who was his "daughter's godfather." As a result of the Gambino associate and others' attendance at the defendant's daughter's wedding, the defendant was found guilty of violating a condition of his supervised release, his supervised release was modified and he was sanctioned with 90 days in a residential re-entry center.

At the time of the defendant's arrest and indeed during his period of supervised release, he was a well-regarded captain in the Bonanno family, having risen to a leadership role. During a July 19, 2012 consensual recording, Vincent Asaro stated in substance and in part, that he at that time was reporting to the defendant. In addition, in an August 17, 2012 consensual recording, Vincent Asaro made the following statements about how he had elevated the defendant to the position of acting captain years earlier:

> V. Asaro:    Fuck Jerry. Fuck him in his ass. Fucking Jerry is for Jerry. Jerry's for Jerry. I lost my son. I lost my son when I made him a skipper. I lost my son when I put him there. Jerry's for Jerry. Fucking greedy cocksucker. Greedy cocksucker. Got him a job. $600 a fucking week, he was sending your son to do everything. He didn't do a fucking thing. . . . (UI) the last fucking person in the world (UI). I lost my son when I made him as acting skipper.

Additionally, in a March 8, 2013 consensual recording, Vincent Asaro stated, in substance and in part, that the defendant had sponsored three members of the Bonanno family for induction, which captains are authorized to do in La Cosa Nostra.

Based upon the history and characteristics of this defendant, a sentence at the high-end of the Guidelines range is appropriate. The defendant's longtime association with the Bonanno crime family and commission of crimes on its behalf militate in favor of such a sentence. The fact is that he chose to associate with a dangerous criminal enterprise and ingratiate himself to its leadership by literally following in his father's footsteps, despite his skill set and opportunities to live a law-abiding life. He should be held accountable for that choice. He should also be held accountable for choosing to induct other individuals into that lifestyle after his recent conviction and imprisonment.

### 3.    Other Section 3553(a) Factors

An analysis of the other 3553(a) factors favors a significant sentence of incarceration, specifically in order to promote respect for the law and afford adequate deterrence to criminal conduct. Any lesser sentence would send the wrong message to others considering continuing their association with organized crime.

The defendant argues for a sentence below 63 months' imprisonment. In the defendant's sentencing submission, he does not articulate anywhere – not based upon his upbringing, education, family circumstances, health, or otherwise – a single reason for such an extraordinary departure from the advisory Guidelines. The defendant was raised in a stable family environment and is self-described as a man of "selflessness, his love for his family and friends and his hard work ethic." See Def.'s Ltr. at 8. He further states that he is a "capable and intelligent man" who has "always supported his five children as a provider and as a father." Id. at 10. The defendant is thus better situated than most defendants that come before this Court, having had the benefit of a middle-class upbringing, an education and steady employment in a stable family setting.

The defendant's submission makes clear that his mafia lifestyle, his loyalty to his mafia family, was a choice, not a decision wrought through hardship, desperation or need. He committed these grave crimes as part of his association and oath to a violent, ruthless criminal enterprise, assisting these men in getting away with the worst crime of all – murder. While it is true that the defendant's family will no doubt be saddened by his incarceration and perhaps financially weakened, those are almost always the consequences of incarceration, and nothing about the defendant's family circumstances suggests that a more lenient sentence is appropriate in this case.

7

III.    Conclusion

        For the foregoing reasons, the Court should sentence defendant Jerome Asaro to a term of imprisonment at the high-end of his advisory Guidelines range of 77 to 96 months' imprisonment.

                        Respectfully submitted,

                        LORETTA E. LYNCH
                        United States Attorney

By:      /s/
                        Nicole M. Argentieri
                        Alicyn L. Cooley
                        Assistant U.S. Attorneys
                        (718) 254-6232/6389

cc:     Clerk of Court (ARR) (by ECF)
        Defense counsel (by ECF and E-mail)
        U.S. Probation Officers John Lanigan and Patricia Sullivan (by E-mail)